**E-FILED**
Friday, 29 August, 2014  04:01:56 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| THOMAS WILSON and RANDY BROWN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WARREN COUNTY ILLINOIS, MARTIN | ) | No. 11-CV-4078-SLD-JEH |
| EDWARDS, individually and in his capacity | ) | |
| as Sheriff of Warren County, THOMAS | ) | Judge Sara Darrow |
| CARITHERS, Individually and in his | ) | Magistrate Jonathan E. Hawley |
| capacity as Sheriff's Deputy of Warren | ) | |
| County, Illinois, ALBERT ALGREN, | ) | |
| individually and in his capacity as State's | ) | |
| Attorney of Warren County, Illinois, | ) | |
| RONALD HANSON, MARK JOHNSON, | ) | |
| DOUGLAS REINERS, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS MARTIN EDWARDS' AND WARREN COUNTY'S
MOTION FOR SUMMARY JUDGMENT**

Defendants Martin Edwards ("Sheriff" or "Sheriff Edwards") and Warren County (the "County'), by their attorneys, Julie Koerner and Bhairav Radia, move this court for summary judgment under Federal Rule of Civil Procedure 56 and Local Rule 7.1(D) on all of plaintiffs' claims against them. In support, these defendants state as follows:

**INTRODUCTION**

In the course of their work, Warren County Sheriff's deputies are sometimes shown legal documents or court orders by lay persons claiming they are entitled to some right or the other. The types of legal documents the deputies most commonly come across are summonses, and subpoenas; others, like orders of replevin, are rare. When a deputy is unsure of what a legal

document or court order is or says, or if he has a legal question from the field, the practice is to call the Warren County State's Attorney directly for advice.

On Saturday, September 26, 2009, Thomas Wilson's former business partner, Ronald Hanson, along with his attorney, Mark Johnson, and others, entered onto land occupied by Wilson and hauled away several items of personal property that Hanson claimed he owned. Wilson complained to the Sheriff's Office and Deputy Carithers was dispatched. When Deputy Carithers arrived, Johnson showed him a stack of legal documents he called "court papers" and told him they had a legal right to be on the property. Carithers did not recognize the documents, so he called State's Attorney Albert Algren and relayed what Johnson had told him. Algren told Carithers if Hanson had a court order, then he had a legal right to be on the property and there was nothing they could do to interfere. Carithers formed a belief, based, among other things, on Johnson's representations and his conversation with Algren, that Hanson had a legal right to be there. Wilson testified Carithers did not fully review all the papers Johnson handed him that day. Carithers stood by and kept the peace while Hanson and his crew removed property. Turned out Johnson was not carrying a court order that day, but pleadings he filed on behalf of Hanson the day before in court to initiate a civil action against Wilson to recover personal property and oust him from the Railroad Street property. Deputy Carithers and State's Attorney Algren believe Johnson misrepresented Hanson's authority to remove property that day.

Sheriff Edwards was neither present on the scene nor did anyone contact him about the incident that day. He was not even aware of these events until later.

Plaintiffs bring claims under 42 U.S. § 1983 against the Sheriff in his individual capacity and official capacity as policymaker for the Sheriff's Office with respect to the training of Sheriff's deputies. Plaintiffs claim the Sheriff acting individually and in conspiracy with the

other defendants seized their personal property in violation of their Fourth Amendment rights, and denied them substantive and procedural due process in violation of the Fourteenth Amendment. Plaintiffs also claim the Sheriff's failure to train his officer to require them to examine a court order authorizing seizure of property over objection of its possessor, before allowing such a seizure, resulted in the violation of their rights. In addition, they claim the Sheriff's subsequent refusal to take steps to remedy the harm caused by Carithers amounted to an adoption or ratification of Carithers' gross inability to determine a court existed so as to hold the Sheriff liable as a policymaker. The County is sued only as a necessary party.

No material fact concerning any of the claims against the Sheriff is genuinely in dispute, and the Sheriff and the County are entitled to judgment as a matter of law. The Sheriff cannot be liable on the seizure and due process claims because he was not personally involved in the deprivation of any property. Moreover, there is no evidence whatsoever of any agreement between the Sheriff and the other defendants to prove a conspiracy. The failure to train claim fails for several reasons. As an initial matter, if the court determines Deputy Carithers did not violate plaintiffs' constitutional rights[1], then the Sheriff cannot be held liable. Second, the failure to train claim mistakenly assumes the Sheriff does not require his deputies to examine documents. Third, even liberally construed, the claim fails because they cannot show the Sheriff was deliberately indifferent to the need for specific training in properly reviewing legal documents. There is simply no evidence in this case to show that the Sheriff had actual or constructive notice that his alleged failure to train his deputies specifically to properly review legal documents would cause the deputies to violate citizens' constitutional rights. Finally, the Sheriff's subsequent refusal to help Wilson recover his property does not establish adoption or ratification of Deputy Carithers' gross inability to determine the existence of a court order.

---

[1] Deputy Carithers has moved for summary judgment on the claims against him (Doc. 80).

**EXHIBITS**

Attached to this motion are true and accurate copies of the following documents:

Exhibit A:      Transcript of deposition of Martin Edwards

Exhibit B:      Transcript of deposition of Thomas Carithers

Exhibit C:      Transcript of deposition of Albert Algren

Exhibit D:      Transcript of deposition of Ronald Hanson

Exhibit E:      Transcript of deposition of Mark Johnson

Exhibit F:      Transcript of deposition of Douglas Reiners

Exhibit G:      Transcript of deposition of Thomas Wilson

Exhibit H:      Transcript of deposition of Randy Brown

Exhibit I:      Martin Edwards' Answers to Plaintiffs' Interrogatories

Exhibit J:      Thomas Wilson's Answers to Martin Edwards' Interrogatories

Exhibit K:      Randy Brown's Answers to Martin Edwards' Interrogatories

Exhibit L:      Thomas Carithers' Answers to Plaintiffs' Interrogatories

Exhibit M:      Affidavit of Martin Edwards

**UNDISPUTED MATERIAL FACTS**

1.      When the events underlying this lawsuit occurred, defendant Martin Edwards was the Sheriff of Warren County, Illinois; co-defendant Thomas Carithers was a Sheriff's Deputy and employee of the Warren County Sheriff's Office; and defendant Albert Algren was the State's Attorney of Warren County (Doc. 43, Warren County and Martin Edwards' Answer to Plaintiffs' First Amended Complaint, ¶¶ 5-7).

2.      Martin Edwards has been the sheriff of Warren County since August 2005 (Ex. A, Edwards Dep., p. 7).

3.      Sheriff Edwards is responsible for formulating and supervising the policies, customs, training, and regulations governing employees of the Warren County Sheriff's Office (Doc. 43, Warren County and Martin Edwards' Answer to Plaintiffs' First Amended Complaint, ¶ 5).

4.      The Illinois Law Enforcement Training and Standards Board is an organization that establishes and approves training programs for all officers within Illinois. The Board's purpose is to ensure that all municipal and county law enforcement and correctional officers within the state are prepared to address the circumstances they will encounter while performing their duties. See Illinois Police Training Act, 50 ILCS 705/1.

5.      All full-time law enforcement officers in Illinois must complete the Law Enforcement Basic Training Course within six months of initial full-time employment. See Illinois Police Training Act - 50 ILCS 705/8.1.

6.      All persons hired as deputies by the Warren County Sheriff's Department must complete within six months of hire or have completed the 12-week Law Enforcement Basic Training Course mandated by the Illinois Law Enforcement Training and Standards Board (Ex. A, Edwards Dep., pp.56-58; Illinois Police Training Act - 50 ILCS 705/8.1).

7.      Deputy Carithers graduated from Carl Sandburg College in 1974 with a degree in law enforcement (Ex. B, Carithers Dep., pp. 6-8).

8.      Deputy Carithers joined the Warren County Sheriff's Department in 2001 (Ex. B, Carithers Dep., p. 10).

9.      Before joining the Warren County Sheriff's Office, Deputy Carithers had completed the 12-week Law Enforcement Basic Training Course mandated by the Illinois Law Enforcement Training and Standards Board (Ex. I, Sheriff Edwards Answers to Plaintiffs' Interrogatories, no. 8; Ex. A, Edwards Dep., pp. 57-58).

10.     Deputy Carithers' work experience as a law enforcement officer before joining the Warren County Sheriff's Office in 2001 includes about a year and half with the Galesburg police department; a year with the Monmouth police department; five years with the Knox County sheriff's department; five years with the Abingdon police department; and a year with the Collier County sheriff's department in Napes, Florida (Ex. B, Carithers Dep., pp. 9-10).

11.     From 1974 until 2013, Deputy Carithers has taken law enforcement courses at the Western Illinois Institute, as part of the in-service training provided by all the law enforcement agencies in which he has been employed (Ex. Carithers Dep., pp. 6-8).

12.     It is not unusual for people to hand Sheriff's deputies legal documents and claim they have an order allowing them to do something (Ex. A, Edwards Dep., pp. 52-53; Ex. C, Algren Dep., pp. 97-98)

13.     When Warren County Sheriff's deputies are handed legal documents by someone, Sheriff Edwards and State's Attorney Algren expect them to review the documents, if they have a reasonable opportunity to do so (Ex. A, Edwards Dep., pp. 55; Ex. C, Algren Dep., pp.103-104).

14.     In the course of their work, the types of legal documents Warren County Sheriff's deputies commonly come across are orders of protection, subpoenas, and summonses. They rarely come across replevin orders. The Sheriff has come across only one replevin order in eight years, and Carithers has never had to deal with one (Ex. A, Edwards Dep., pp. 14-15, Ex. B, Carithers Dep., p. 12, 33, Ex. C, Algren Dep., pp. 99-100).

15.     Sheriff Edwards believes his deputies are well-versed in picking out and understanding court orders they commonly come across at work, such as orders of protections (Ex. A, Edwards Dep., pp. 53-55).

16.    Sheriff Edwards expects that when his deputies are faced with legal documents or court orders they do not commonly come across, they would examine the document, and if they had questions, they would call the State's Attorney (Ex. A, Edwards Dep., pp. 53-55).

17.    Sheriff Edwards does not believe that his deputies, in general, are incapable of picking out court orders from a stack of legal papers handed to them (Ex. A, Edwards Dep., pp. 53-54; Ex. C, Algren Dep., pp. 98-100).

18.    Based on his almost daily interaction with deputies from the Sheriff's Office, State's Attorney Algren's believes, generally, most deputies should be able to recognize a court order when they see one, because almost all court orders have the word "order" in the caption and the judge's signature at the end (Ex. C, Algren Dep., 98-99).

19.    It is the practice of the Warren County Sheriff's Office that if a deputy is unsure about what some legal document or court order means or faces a legal question while on duty, he is expected to call and get advice from the State's Attorney (Ex. A, Edwards Dep., pp. 30-31, 45-46, 53-56; Ex. C, Algren Dep., 70-72, 105-107).

20.    Sheriff Edwards believed Deputy Carithers had the maturity and the competence to know when to make a phone call if he was unclear about how to proceed in a situation (Ex. A, Edwards Dep., p. 56).

21.    Sheriff Edwards was not on duty on Saturday, September 26, 2009 and did not go to the Railroad Street property in Cameron, Illinois, on September 26, 2009 (Ex. A, Edwards Dep., pp. 40-43).

22.    No one contacted Sheriff Edwards on September 26, 2009, and he became aware of the incident underlying this lawsuit only after the fact (Ex. A, Edwards Dep., pp. 40-43).

23.     Sheriff Edwards did not meet Johnson, Hanson, or Reiners, or communicate with them in any manner before September 26, 2009 (Ex. E, Johnson Dep., p. 214; Ex. D, Hanson Dep., pp. 192-195; Ex. F, Reiners Dep., p. 101).

24.     Plaintiffs Wilson and Brown are not aware of any meetings, conversations, or plans between Sheriff Edwards and the other defendants regarding any intention to deprive Wilson of his property or violate his rights on September 26, 2009 (Ex. G, Wilson Dep., pp. 210-211, 216; Ex. H, Brown Dep., p. 61).

25.     Wilson testified he met Sheriff Edwards after September 26, 2009 on one occasion and asked him how someone could have come and removed his property without a court order despite a deputy being present (Ex. G, Wilson Dep., pp 171-176).

26.     The Sheriff said it was a civil matter, someone had asked for assistance and the deputy had been sent to keep the peace. Wilson asked the Sheriff to get Carithers in the room to discuss the matter, but the Sheriff refused (Ex. G, Wilson Dep., pp 171-176).

27.     The Sheriff confirmed that a person in a civil dispute over property with another person cannot seize property from the other person without getting a court order. The Sheriff also confirmed there was no court order for the property that was removed on September 26, 2009.

28.     Wilson asked if the removal of property without a court order amounted to theft. The Sheriff said no, and repeated it was a civil matter. Wilson got frustrated with the Sheriff's apparent unwillingness to act and left. (Ex. G, Wilson Dep., pp 171-176).

29.     In response to an interrogatory asking the plaintiffs to identify all the evidence in support of their claim that the Warren County Sheriff had a "policy or custom" of "failure to train its officers to require to examine a court order authorizing the seizure of property over the objection of its possessor, before allowing such a seizure," they each gave the following answer:

"On September 26, 2009, Carithers made no attempt to determine for himself whether or not Mark Johnson, Ronald Hanson, or Douglas Reiners had a court order. Martin Edwards has stated that the Warren County Sheriff's Department has no training program for new hires nor a budget item for it."

(Ex. J, Plaintiff Wilson's Answers to Sheriff Edwards' Interrogatories, no. 13; Ex. K, Plaintiff Brown's Answers to Sheriff Edwards' Interrogatories, no. 13).

30.     In response to an interrogatory asking the plaintiffs to identify all the evidence in support of their allegation that Sheriff Edwards was deliberately indifferent to Deputy Carithers' "gross inability to determine whether a court order existed" authorizing Johnson's, Hanson's, Reiner's presence on Wilson's property over his objection on September 26, 2009," specifically, all evidence to support that the Sheriff (1) knew or should have known about this alleged "gross inability," and (2) turned a blind eye to it," they each gave the following answer:

"Martin Edwards has stated he 'inherited' Thomas Carithers as a deputy and that he did not believed he had been adequately trained."

(Ex. J, Plaintiff Wilson's Answers to Sheriff Edwards' Interrogatories, no. 15; Ex. K, Plaintiff Brown's Answers to Sheriff Edwards' Interrogatories, no. 15).

31.     Plaintiffs Wilson and Brown admitted they have no personal knowledge of Sheriff Edwards saying he 'inherited' Thomas Carithers as a deputy and that he did not believe he had been adequately trained;" and Plaintiff Brown admitted he does not know of anyone who has heard the Sheriff make that statement, or read anything where that statement was attributed to the Sheriff (Ex. G, Wilson Dep., pp. 180-182; Ex. H, Brown Dep., pp. 63-64).

32.     In response to an interrogatory asking plaintiffs to identify all evidence in support of their claim that Sheriff Edwards "adopted or ratified" Deputy Carithers' "gross inability to determine whether a court order existed" authorizing Johnson's, Hanson's, Reiner's presence on Wilson's property over his objection on September 26, 2009," they each gave the following answer:

"Martin Edwards refused to take steps to remedy the harm caused by his deputy's conduct when it was made known to him."

(Ex. J, Plaintiff Wilson's Answers to Sheriff Edwards' Interrogatories, no. 16; Ex. K, Plaintiff Brown's Answers to Sheriff Edwards' Interrogatories, no. 16).

33.     On or before September 26, 2009, Sheriff Edwards was not aware of any inability on the part of any Warren County Sheriff's deputy in properly handling civil process papers (Ex. I, Sheriff Edwards Answers to Plaintiffs' Interrogatories, no. 8).

34.     On or before September 26, 2009, Sheriff Edwards was not aware of any inability on the part of any Warren County Sheriff's deputy in examining or reviewing legal documents or court orders they commonly came across (Ex. M, Edwards Affidavit, ¶ 5).

35.     On or before September 26, 2009, Sheriff Edwards was not aware of any instance where a Warren County Sheriff's deputy was unable to properly deal with a situation involving examining or reviewing legal documents or court orders (Ex. M, Edwards Affidavit, ¶ 6).

36.     On or before September 26, 2009, Sheriff Edwards was not aware of any instance where a Warren County Sheriff's deputy's failure to determine the existence of a court order, examine a court order, or properly review legal documents or court order resulted in a lawsuit alleging the violation of a citizen's constitutional rights (Ex. M, Edwards Affidavit, ¶ 7).

## ARGUMENT

A court should grant summary judgment if "there is no genuine issue of material fact and. . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to identify evidence that demonstrates an absence of a genuine issue of material fact.  *See id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat a motion for summary judgment, the non-moving party must set forth evidence that demonstrates disputed facts, showing a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256 (1986). In deciding a motion for summary judgment, the court must read the facts in a light most favorable to the non-moving party. *Id.* at 255.

Under this standard, the court should grant summary judgment to Sheriff Edwards and Warren County because there is no genuine dispute of material fact concerning any of the claims against them, and they are entitled to judgment as a matter of law.

**I.**   **The seizure and due process claims must be dismissed because the Sheriff lacked personal involvement in the deprivation of plaintiffs' property.**

It is well settled that a defendant cannot be liable in his individual capacity under Section 1983 unless he was "personally responsible" for the deprivation of the constitutional right at issue. *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir.2001) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995)). So, a supervisor cannot be held vicariously liable in a Section 1983 action for the acts of a subordinate employee. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994); *see also Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003) (explaining a police chief "cannot be liable for any constitutional violations committed by his officer simply by virtue of his supervisory role.") For a supervisor to be personally responsible or involved, he must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Matthews v. City of East St. Louis*, 675 F. 3d 703, 708 (7th Cir. 2012) (internal quote and citation omitted).

In this case, the undisputed facts show Sheriff Edwards was not personally involved in the deprivation of plaintiffs' property or due process rights. The Sheriff was not present at the Railroad Street properties on September 26, 2009 (Undisputed Material Facts (hereafter "UMF") ¶ 21). In fact, the Sheriff did not even know Wilson had called the Sheriff's Office and Carithers had been dispatched in response (UMF ¶ 22). The Sheriff was not in contact with Deputy Carithers or anyone else at the scene that day (UMF ¶ 23). The Sheriff simply was unaware of

what was going on at the Railroad Street properties. Nor did the Sheriff know that Johnson, Hanson, or Reiners had planned to go to the Railroad Street properties on September 26, 2009 (UMF ¶¶ 23). In short, there is simply no evidence for a jury to conclude that as a supervisor, the Sheriff knew of Carithers' conduct on September 26, 2009, much less facilitated, approved, condoned, or turned a blind eye to it. Because of the absence of any evidence of the Sheriff's personal involvement, the court must grant summary judgment in his favor on the seizure claim under the Fourth Amendment and the due process claims under the Fourteenth Amendment.

**II.     There is no evidence of a conspiracy between the Sheriff and the other defendants.**

To establish a civil conspiracy claim under Section 1983, plaintiffs must show that Sheriff Edwards and the other individual defendants agreed to deprive them of their constitutional rights. *See Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir.2007).

Here, there is no simply no evidence to show that Sheriff Edwards reached any agreement or plan with any of the other defendants on or before September 26, 2009. There is no evidence the Sheriff communicated with Hanson, Johnson, or Reiners on or before September 26, 2009 about anything at all (UMF ¶ 23). And plaintiffs are not aware of any communication between Sheriff Edwards and the other defendants regarding any intention to deprive Wilson of his property or violate his rights on September 26, 2009 (UMF ¶ 24). Therefore, the Sheriff is entitled to summary judgment on the conspiracy claim.

**III.    Plaintiffs' cannot meet their burden of proving their *Monell* claims.**

**A.     Sheriff Edwards cannot be liable on the *Monell* claims if Deputy Carithers did not violate plaintiffs' rights.**

For liability to attach under Section 1983, to a local government a plaintiff must establish that an unconstitutional policy of the local government caused the alleged constitutional violation committed by the sheriff's employee. *Monell v. New York City Dep't of Soc. Serv's*., 436 U.S.

658, 690 (1978). Thus, if there is no constitutional violation, there can be no liability on the part of the official policymaker. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Sallenger v. City of Springfield*, 630 F.3d 499, 504-05 (7th Cir. 2010) (In a failure to train case, "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."); *Alexander v. City of South Bend*, 433 F.3d 550, 557-558 (7th Cir. 2006) (same).

Here, plaintiffs claim Sheriff Edwards' failure to train its officers to require them to examine a court order authorizing seizure of property over objection of its possessor, before allowing such a seizure, resulted in the violation of their rights by Deputy Carithers on September 26, 2009 (First Amended Complaint, Doc. 39, ¶¶ 38, 41). Plaintiffs also claim the Sheriff's subsequent refusal to take steps to remedy the harm caused by Carithers amounted to an 'adoption' or 'ratification' of Carithers' gross inability to determine if a court order existed that day so as to hold the Sheriff liable as a policymaker (First Amended Complaint, Doc. 39, ¶¶ 39, 41). Deputy Carithers has filed a motion for summary judgment on all claims against him (Doc. 80). So, as a threshold matter, the court should first consider Carithers' motion. If the court determines Carithers did not violate plaintiffs' rights, then it need not even consider plaintiffs' *Monell* claim against the Sheriff because the Sheriff cannot be liable for failing to train Carithers or for adopting or ratifying his conduct if that conduct itself did not amount to a constitutional violation. *See Sallenger*, 630 F.3d at 504-05; *Alexander*, 433 F.3d at 557-558.

Even if the court determines a reasonable jury could find that Deputy Carithers' violated plaintiffs' rights, the *Monell* claim cannot survive summary judgment for the following reasons.

**B.**     **Plaintiffs' failure-to-train claim rests on a false premise.**

A local government, such as the sheriff here, can be found liable only where the sheriff's official policy (including custom or practice) *itself* causes the constitutional violation, not on the basis of vicarious liability or *respondeat superior.* *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 693-94 (1978. In their complaint, plaintiffs allege Sheriff Edwards' failure to train its officers to require them to examine a court order authorizing seizure of property over objection of its possessor, before allowing such a seizure, resulted in the violation of their rights by Deputy Carithers on September 26, 2009 (First Amended Complaint, Doc. 39, ¶¶ 38, 41).

The problem for plaintiffs is their failure-to-train claim mistakenly assumes the Sheriff does not require his deputies to examine a court order authorizing seizure of property. The undisputed facts in this case show that Sheriff Edwards expects his deputies will examine legal documents or court orders presented to them, if they have a reasonable opportunity to do so (UMF ¶¶ 12-15). If, upon examining the legal documents or court orders, the deputy has questions, he is expected and encouraged to call the state's attorney for advice (UMF ¶¶ 16, 19).. In other words, the deputies are not expected to interpret court orders or legal documents without advice from the state's attorney. But not requiring deputies to *interpret* unfamiliar court orders or legal documents does not mean they are not required to *examine* court orders at all. In short, because deputies are required to examine legal documents, a failure to train claim premised on the opposite is factually unsupported and logically untenable.

Even liberally construing plaintiffs' failure-to-train claim to rest, instead, on the theory that the Sheriff does not train his deputies in how to *properly* review legal documents to determine the existence of court orders or does not train them on how to interpret court orders (First Amended Complaint, Doc. 39, ¶¶ 39, 41), the claim still cannot survive summary judgment

because plaintiffs cannot meet the strict standards for proving causation and culpability that constrain local governmental liability under Section 1983.

**C.      Plaintiff cannot show the Sheriff was deliberately indifferent to the need for specific training.**

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, ___U.S.___, 131 S. Ct. 1350, 1359 (2011). But, as the Supreme Court has emphasized, "a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. (*citing Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985). Only when a municipality's failure to train its employees "in a relevant respect" amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact," can such a failure be thought of as a  " 'policy or custom' that is actionable under Section 1983.  *Connick*, 131 S.Ct. at 1359-1360. (internal citation and quotation marks omitted, brackets and emphasis in original); *see also Matthews v. City of E. St. Louis*, 675 F.3d 703, 709 (7th Cir.2012).

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 131 S.Ct. at 1360 (citing *Board of Cty Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407-410 (1997).

In this case, for purposes of this motion, Sheriff Edwards is the policymaker as he is responsible for formulating and supervising the training of employees of the Warren County Sheriff's Office (UMF ¶ 3). Even liberally construing plaintiffs' claim, there is simply no

evidence in this case to show that the Sheriff had actual or constructive notice that his alleged failure to train his deputies specifically to properly review legal documents or interpret court orders would cause the deputies to violate citizens' constitutional rights.

**1.      Plaintiffs have no evidence of a pattern of similar constitutional violations.**

The Supreme Court has made clear "a pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S.Ct. at 1360.

Here, plaintiffs simply have no evidence whatsoever to show that before September 26, 2009, Warren County Sheriff's deputies committed constitutional violations of persons by not properly reviewing legal documents or interpreting court that  would have placed the Sheriff on notice that their training was inadequate. Sheriff Edwards was not aware of any instance where a deputy's failure to determine the existence of a court order, examine a court order, or properly review legal documents or court order resulted in a lawsuit alleging the violation of a citizen's constitutional rights not aware of any constititional violations committed by his deputies invloving the failure to properly examine legal documents (UMF ¶ 36). Moreover, the Sheriff was not aware of any inability on the part of any deputy in properly handling civil process papers, examining or reviewing legal documents or court orders they commonly came across, or properly deal with a situation involving examining or reviewing legal documents or court orders (UMF ¶ 35). Plaintiffs also have no evidence of prior constitutional violations committed by Warren County Sheriff's deputies (UMF ¶¶ 29-32). So, there is no simply no evidence in the record from which a reasonable jury can determine if Warren County Sheriff's deputies committed *any* similar constitutional violations before September 26, 2009, much less the violations were similar or constituted a pattern. Consequently, nothing in the record establishes a

reasonable policymaker would have known if the officers were not provided specific training in properly reviewing legal documents it would likely result in the deprivation of someone's constitutional rights. *See Pena v. Leombruni*, 200 F.3d 1031, 1033, 1034 (7th Cir. 1999) ("If Winnebago County had seen a rash of police killings of crazy people and it was understood that these killings could have been avoided by the adoption of measures that would adequately protect the endangered police, then the failure to take these measures might . . . be found to manifest deliberate indifference to the rights of such people.").

Plaintiffs point to evidence that "on September 26, 2009, Carithers made no attempt to determine for himself whether or not Mark Johnson, Ronald Hanson, or Douglas Reiners had a court order" (UMF ¶ 29). But even assuming a jury determines that plaintiffs' constitutional rights were violated by Carithers' failure to properly review or interpret legal documents or his inability to determine the existence of a court order, this single instance is not enough to show a pattern of unconstitutional conduct for purposes of showing deliberate indifference. *See Thomas v. Cook County*, 588 F. 3d 445, 454 (7th Cir. 2009) (internal quotes and citations omitted) (noting that "there is no clear consensus as to how frequently [unconstitutional] conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three.").

In short, armed with only a single incident of (alleged) unconstitutional conduct, plaintiffs cannot show the Sheriff was on constructive notice that specific training was necessary to avoid the constitutional violation at issue here. *See Dye v. Wargo*, 253 F.3d 296, 299 (7th Cir.2001). Consequently, plaintiffs' failure to train can survive summary judgment only if they can show the need for the specific training at issue was so obvious that it falls within the "narrow range of circumstances" where the Supreme Court has allowed a "single-incident" theory of *Monell* liability might be sufficient. On this record, as explained below, they cannot.

2.      **Plaintiffs cannot show the need for specific training was obvious.**

The Supreme Court in *Connick* recognized that 'in a narrow range of circumstances,'

deliberate indifference in a failure-to-train case also can rest on a "single-incident" theory of

liability. *Connick*, 131 S.Ct. at 1361 (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)). In

other words, there may be the "rare" case of "single-incident liability" in which "the

unconstitutional consequences of failing to train could be so patently obvious that a city could be

liable under § 1983 without proof of a pre-existing pattern of violations." *Id*. To fall within this

narrow range, the alleged harm must be a "highly predictable consequence" of a policy. *Connick*,

131 S.Ct. at 1361 (quoting *Bryan County*., 520 U.S. at 409).

The hypothetical the Supreme Court gave in *Canton* was of a municipality that arms its

police officers with firearms and deploys the armed officers into the public to apprehend fleeing

felons without training the officers in the constitutional limitation on the use of deadly force. *See*

*Connick*, 131 S.Ct. at 1361 (citing *Canton*, 489 U.S. at 390 n. 10). The Court explained that

given the known frequency with which police try to arrest fleeing felons and the "predictability

that an officer lacking specific tools to handle that situation will violate citizens' rights," ... a

city's decision not to train the officers about constitutional limits on the use of deadly force could

reflect the city's deliberate indifference to the "highly predictable consequence," namely,

violations of constitutional rights. *Id*.(citing *Bryan County*, 520 U.S. at 409).

In *Connick*, the Court held that the narrow range of circumstances in which a "single-

incident" theory of liability could prevail did not encompass the failure to train prosecutors in

their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). 131 S.Ct. at 1360–65. The Court

explained that a *Brady* violation was not an "obvious consequence" of that failure to train, given

that prosecutors are independently equipped and ethically obligated to understand and comply with *Brady*. *Id*., at 1360–61.

Here, the deprivation of their personal property by the private defendants on September 26, 2009 was a less highly predictable consequence of the alleged failure to train Sheriff's deputies in reviewing and interpreting legal documents than an excessive force violation is of failing to train officers on the constitutional limits on the use of deadly force, and a *Brady* violation is of failing to train prosecutors about *Brady*. The Sheriff does not believe that his deputies, in general, are incapable of picking out court orders from a stack of legal papers handed to them (UMF ¶ 17). The Sheriff believes his deputies are well-versed in picking out and understanding court orders they commonly come across at work (UMF ¶ 15). The most common types of court orders and legal documents Warren County Sheriff's deputies see in the usual course are orders of protection, subpoenas, and summons (UMF ¶ 14). Others, like orders of replevin, are rare (UMF ¶ 14). The Sheriff expects when his deputies are faced with legal documents or court orders they do not commonly come across, they will examine the document (UMF ¶ 16). It is the practice of the Warren County Sheriff's Office that if a deputy is unsure about what some legal document or court order means or faces a legal question while on duty, he is expected to call and get advice from the State's Attorney (UMF ¶¶ 16, 19). Based on his almost daily interaction with Warren County deputies, State's Attorney Algren's believes, generally, most deputies should be able to recognize a court order when they see one, because almost all court orders have the word "order" in the caption (UMF ¶ 18).

In light of the above, no reasonable jury could find that the deprivation of plaintiffs' property or similar recurring constitutional violations were the 'obvious consequence' of the failure to provide deputies with specific training on reviewing legal documents. There is no

evidence that before September 26, 2009, the deputies were incapable of picking out court orders from legal papers handed to them. Sheriff Edwards reasonably expected his deputies would examine legal documents shown to them, recognize and understand court orders they commonly encountered, and call the state's attorney for advice if they were unsure about a document, or had any legal questions. Under these circumstances, Sheriff Edwards was reasonable in believing his deputies had the tools they needed to handle the situation Deputy Carithers faced on September 26, 2009, "in the absence of a specific reason, such as a pattern of violations, to believe that those tools [were] insufficient to prevent future constitutional violations in "the usual and recurring situations" the deputies faced. *See Connick*, 131 S.Ct. at 1363.

This case is not like the hypothetical in *Canton*, where the court assumed the officers had no knowledge *at all* of the constitutional limits on the use of deadly force. As noted above, it is undisputed the deputies in Warren County are well versed in the types of legal documents and court orders they usually come across. So, they would reasonably be expected to recognize a court order when they saw one.. Indeed, Deputy Carithers, unlike the novice police officers in the *Canton* hypothetical, was an experienced law enforcement officer with about 12 years on the job even before he joined the Warren County Sheriff's Office. Plaintiffs cannot, therefore, rely on the "utter lack of an ability to cope with constitutional situations that underlies the *Canton* hypothetical." *See Connick*, 131 S. Ct. at 1365. Rather, plaintiffs can only assert that the deputies were not trained specifically to  review and interpret particular types of court orders, or the specific fact pattern concerning the deprivation of property in this case. *See id*. But that is exactly the "sort of nuance" rejected by the Supreme Court in *Connick*. *See id*.(holding that failure to provide prosecutors with specific training about particular *Brady* violations such as non-

disclosure of blood-test evidence resulting in a defendant's wrongful conviction and 18-year sentence was not so obvious as to hold the district attorney's office liable).

Even if the court decides the failure to provide specific training in reviewing legal documents and interpreting court orders could lead to "single-incident" liability in a failure-to-train case, plaintiffs do not have sufficient evidence to prove their claim at trial. To prove a failure-to-train claim, plaintiff must do more than demonstrate that an "injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury causing conduct," since even adequately trained officers make mistakes. *Canton*, 489 U.S. at 391. This is so because Section 1983 "does not provide plaintiffs or courts carte blanche to micromanage local governments throughout the United States" with respect to the training they provide. *Id*; *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) ("The existence or possibility of other better policies which might have been used does not necessarily mean that the [city] was being deliberately indifferent."). Thus, the issue is not what training the Sheriff *could* have provided his deputies, but on how the training the deputies *did* receive is deficient in a manner closely related to the ultimate injury. *City of Canton*, 489 U.S. at 390-91; *see also Palmquist v. Selvik,*111 F. 3d 1332, 1344-45 (7th Cir. 1997).

In this case - besides the single incident of Carithers' alleged wrongdoing that day - the only evidence plaintiffs have to support their failure to train claim is that Sheriff Edwards allegedly stated the Warren County Sheriff's Department has no training program for new hires nor a budget item for it (UMF ¶ 29). But the Supreme Court has rejected the notion that the absence of any formal in-house training in an area equates to the complete absence of training. *Connick*, 131 S.Ct. at 1363. The Court emphasized that "failure-to-train liability is concerned with the substance of ther training, not the particular instructional format." *Id*. Accordingly, in

identifying deficiencies in the training the officers received, the court must make sure not to "ignore the training the officers did receive" at the police academy. *Palmquist*, 111 F.3d at 1345. Here, it is undisputed that  a person hired as deputy in the Sheriff's Office must have completed the basic recruit training program mandated by the Illinois Law Enforcement Training and Standard Board (UMF ¶¶ 4-6). There is no evidence Illinois state standards or the basic recruit training program are in any way deficient. *See Palmquist*, 111 F.3d at 1345; *Tapia v. City of Greenwood*, 965 F.2d 336, (7th Cir. 1992) (taking into account the absence of evidence to show that the city failed to adhere to the minimum state standards for training police officers in concluding that the need for additional training was not so obvious to the city's policymakers).

In *Palmquist*, a jury found that the village's failure to train its police officers for dealing with persons exhibiting abnormal behavior resulted in a sergeant shooting a suicidal person to death. 111 F.3d at 1332-1335. The police chief testified that the village did not require its officers to be trained specifically in handling abnormally behaving persons in addition to the basic recruit police training they received. *Id*. at 1344-45. The jury also heard the officers testify that they could not recall the training they received. *Id*. at 1345. The sergeant had been a police officer for thirteen years and a sergeant for five; and had undergone extensive formal and informal training in other subjects. *Id*. at 1336. The Seventh Circuit reversed, rejecting the argument that "no special training = deficient training." *Id*. at 1345-1347. The court said you cannot  ignore the training the officers did receive. *Id*. at 1345. Among other things, the court pointed out there was no evidence, from any witness, that "Illinois state standards for training police in handling abnormal behavior are in any way deficient under the constitution." *Id*. at 1345.  Here, Deputy Carithers, like the sergeant in *Palmquist*, had completed the basic recruit training program mandated by the Illinois state standards board, and completed various in-

service training provided through the various police departments he worked in over the years (UMF ¶¶ 8-11).  And Carithers was a veteran officer with almost 20 years experience as  a police officer -eight years more experience than the sergeant in *Palmquist* (UMF ¶¶ 8-11)

Compared to the plaintiff in *Palmquist*, plaintiffs in this case have far less evidence on training the deputies received. They do not have any evidence regarding the particulars of the State basic recruit training program, or on any other training Warren County Sheriff's deputies received before September 26, 2009, much less evidence that would permit a reasonable jury to conclude "that such training, supervision, and discipline are so obviously inadequate as to result in the violation of constitutional rights." *Edwards v. Two Unknown Male Chicago Police Officers*, 623 F.Supp.2d 940, 952 (N.D.Ill.2009). As a result, plaintiffs' cannot prevail on a "single-incident" theory of failure-to-train liability. *See Palmer*, 327 F.3d at 597 (failure-to-train claim failed where plaintiff "did not present so much as a scintilla of evidence that the defendants improperly hired, trained, or supervised the [municipal] staff"),

In sum, because plaintiffs cannot show the Sheriff was on actual or constructive notice that specific training was necessary to avoid the constitutional violation at issue here, they cannot show that he then made a conscious choice not to provide that training. In other words, plaintiffs cannot prove the Sheriff was 'deliberately indifferent.' Therefore, the Sheriff is entitled to summary judgment on plaintiffs' failure to trian claim. *See Connick*, 131 S.Ct. at 1360-1364; *Dye v. Wargo*, 253 F.3d 296, 299 (7th Cir.2001) (summary judgment appropriate where plaintiff "has not offered any evidence that use of excessive force is common in [the municipality], indeed has not produced evidence of even one prior incident. Thus the City cannot be held liable on the theory that lack of more extensive training for [defendants] evinces a policy of using constitutionally improper force").

**D.    The Sheriff's refusal to help recover plaintiffs' property is not a 'ratification' of Carither's conduct.**

Plaintiffs allege that after September 26, 2009, the Sheriff, as a policymaker, "adopted or ratified" Deputy Carithers' "gross inability to determine whether a court order existed authorizing Johnson's, Hanson's, or reiner's presence on Wilson's property over his objection on September 26, 2009" (First Amended Complaint, Doc.39, ¶¶ 39). The only evidence plaintiffs identify in support of this claim is their assertion that the Sheriff "refused to take steps to remedy the harm caused by his deputy's conduct when it was made known to him." (UMF ¶ 32).

The failure of a policymaking official to take remedial measures does not trigger liability under Section 1983. *See Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989). Accordingly, A plaintiff cannot impute liability on a municipality under Section 1983 on the basis that the municipality failed to investigate an incident or failed to punish the alleged wrongdoer. *Rogers v. City of Little Rock*, 152 F.3d 790, 799 (8th Cir. 1998). Similary, the decision of a supervisor not to discipline a lower-ranking official does not amount to a municipal "policy." *Baskin v. City of Des Plaines*, 138 F.3d 701 (7th Cir. 1998)(involving allegations that city refused to accept plaintiff's complaint about the defendant or take any action against officer). And the failure to eliminate a practice does not establish approval of that practice. *See Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993).

In this case, there simply is no evidence to show that the Sheriff "adopted" or "ratified" Deputy Carithers so as to impute liability to him as a policymaker. Wilson testified that after his property was removed by Hanson on September 26, 2009, he complained to the Sheriff in person and asked him how someone could do that without a court order (UMF ¶ 25). The Sheriff confirmed that under the circumstances, court order was required to remove the property (UMF ¶ 27). Wilson asked the Sheriff if the removal without a court order amounted to theft (UMF ¶ 28).

24

The Sheriff said it did not; rather, it was a civil matter (UMF ¶ 28). The Sheriff also refused to call Carithers in the rooom to discuss the matter (UMF ¶ 26). In short, plaintiffs can show at most that Sheriff Edwards refused to treat the removal of the property as a theft and was unwilling to help recover the property from Hanson. But, as noted above, the refusal to remedy plaintiffs' harm does not amount to 'ratification' of Carithers' conduct. And the sheriff's apparent unwillingness to agree with plaintiffs that Carithers' actions were wrong that day cannot prove he adopted or ratified the conduct. *See Lawrence v. Kenosha County*, 391 F.3d 837, 843-844 (7th Cir. 2004)(holding that the sheriff's letter to plaintiff in response to a citizen's complaint, in which the sheriff said the officer acted appropriately in using force against the citizen, was not proof that the county "ratified and approved" the use of excessive force). Therefore, Sheriff Edwards is entitled to summary judgment on plaintiffs' *Monell* policy claim.

## CONCLUSION

For the foregoing reasons, Sheriff Edwards and Warren County request the court to grant summary judgment in their favor and dismiss the claims against them with prejudice.

Respectfully submitted,

**WARREN COUNTY, MARTIN EDWARDS, THOMAS CARITHERS, and ALBERT ALGREN**

By:      *s/Bhairav Radia*
One of Their Attorneys

Julie M. Koerner, #
Bhairav Radia, #6293600
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Phone: 847/291-0200
Fax:     847/291-9230
Email: bradia@okgc.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| THOMAS WILSON *et. al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 11-CV-4078-SLD-JEH |
| v. | ) | |
| | ) | Judge Sara Darrow |
| WARREN COUNTY, ILLINOIS *et al.*, | ) | |
| | ) | Magistrate John Hawley |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2014, I electronically filed **DEFENDANTS MARTIN EDWARDS' AND WARREN COUNTY'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following registered CM/ECF participant(s):

Brad Ingram

Mark V. Kelly            Mark D. Johnson            John P. Heil, Jr.
kellylaw@divcominc.net   Johnson Law Group          Heyl, Royster, Voelker & Allen
                         mark@johnson-law.net       bingram@heylroyster.com
                                                    jheil@heylroyster.com


By:     s/Bhairav Radia
        Bhairav Radia, #6293600
        O'Halloran Kosoff Geitner & Cook, LLC
        650 Dundee Road, Suite 475
        Northbrook, Illinois 60062
        Phone:  847/291-0200
        Fax:  847/291-9230
        Email: bradia@okgc.com